UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

Glenn W. Frericks                                    Case No.:  TBD

              Plaintiff,

v.

A.H. Bennett Company, a Minnesota corporation;

A.W. Chesterton Company, a Massachusetts
corporation;.

A.W. Kuettel & Sons, Inc., a Minnesota corporation;

American Crystal Sugar Company, a Minnesota
Corporation;

Asbestos Corporation, Ltd., a Canadian corporation;

Bell & Gossett , a division of ITT Corporation, a
foreign corporation;

Building Sprinkler Company, Inc., a North Dakota
corporation;

Burnham, LLC, a Delaware corporation;

CBS Corporation, f/k/a Westinghouse Electric
Corporation, a Delaware corporation;

Cleaver Brooks, Division of Aqua Chem, Inc., a
Delaware corporation;

Crane Company, a Delaware corporation;

Crane-Johnson Company, a North Dakota
corporation;

Crown Cork & Seal Company, Inc., (individually
and as successor-in-interest to Mundet Cork
Corporation), A Pennsylvania corporation;

Fargo-Moorhead Insulation Company, a North
Dakota corporation;

Foster Wheeler LLC, f/k/a Foster Wheeler

**JOINT NOTICE OF REMOVAL OF
DEFENDANTS BUILDING
SPRINKLER COMPANY, INC. AND
A.H. BENNETT COMPANY**

Corporation, a Delaware corporation;

General Electric Company, a foreign business corporation organized under the laws of New York;

Goodyear Tire & Rubber Company, an Ohio corporation;

Goulds Pumps, Inc., a New York corporation;

H.H. Robertson Company, a Pennsylvania corporation;

Hobart Brothers Company, an Ohio corporation;

Industrial Contractors, Inc., a North Dakota corporation;

John Crane, Inc., a Delaware corporation (successor-in-interest to John Crane-Houdaille, Inc. and Crane Packing Company);

Lincoln Electric Company, an Ohio corporation;

Metropolitan Life Insurance Company, a foreign corporation;

Mine Safety Appliances Company, LLC, a Pennsylvania corporation;

Minnesota Mining & Manufacturing, a Delaware corporation;

Paul W. Abbott Company, Inc., a foreign corporation;

Riley Power, Inc., f/k/a Riley Stoker Corporation, a Massachusetts corporation;

Rockbestos-Surprenant Cable Corp. (f/k/a The Rockbestos Company, a Delaware corporation (a wholly owned subsidiary Marmon Corporation;

S.O.S. Products Company, Inc., a New York corporation;

U.S. Filter Co., a foreign corporation;

Union Carbide Corporation, a Delaware
Corporation;

United Conveyor Corporation, an Illinois
corporation;

Weil McLain Company, a Delaware corporation;

Western Steel & Plumbing, Inc., a North Dakota
corporation;

Whittier Filtration, Inc., f/k/a U.S. Filter/Whittier,
Inc., a subsidiary of Water Applications & Systems
Corporation, a Delaware corporation;

Zurn Industries, Inc., a Pennsylvania corporation;

Defendants.

Defendants Building Sprinkler Company, Inc. ("Building Sprinkler") and A.H. Bennett Company ("Bennett") (collectively referred to herein as "Defendants") hereby remove the above-styled civil action from the Cass County District Court for the State of North Dakota, pursuant to 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1446. While reserving the right to respond more fully if a remand is sought by Plaintiff, Defendants provide the following short and plain statement of the basis for its removal as required by 28 U.S.C. § 1446(a).

## I.   FACTUAL BACKGROUND

1.     On July 28, 2021, Plaintiff served a copy of her Summons and Complaint in the above-captioned action on Building Sprinkler, in case styled *Glenn W. Frericks, Plaintiff v. A.H. Bennett Company, a Minnesota corporation, et al.*, *Defendants*, venued in Cass County District Court, East Central Judicial District, for the State of North Dakota, Court file No. 09-2021-CV-02414. On July 30, 2021, Plaintiff also served a copy of her Summons and Complaint on Bennett. A true and correct copy of the Summons and Complaint is attached hereto as "Exhibit 1."

3

2.      Plaintiff alleges that he contracted asbestosis, an asbestos-related disease. Based on these allegations, Plaintiff asserts claims for negligence (Count I), breach of implied warranties (Count II), conspiracy (Count III), and strict liability for defective and unreasonably dangerous product (Count IV).  Plaintiff also asserts claims for fraudulent misrepresentation, enterprise liability, market share liability and alternative liability (Counts V-VIII).  (*See* Ex. 1, Complaint.)

3.      The Complaint does not identify the alleged basis or source of Plaintiff's exposure to asbestos.  (*See id.*)

4.      On April 5, 2022, Plaintiff served his Answers to Defendants' Interrogatories to Plaintiff (Set I).  (*See* Ex. 2, Plaintiff's Answers to Defendants' Interrogatories to Plaintiff (Set I).)  Plaintiff references his written work history, and Plaintiff's discovery responses as the alleged basis or source of Plaintiff's exposure to asbestos.  (*See id.*, Answer to Interrog. No. 4.)

5.      Plaintiff's written work history, attached as an exhibit to Plaintiff's discovery responses, indicates only that Plaintiff was employed at the Grand Forks Air Force Base ("GFAFB") from 1967 to 1969 while serving in the Air Force, where he worked on the heating plant boilers and insulation.  Plaintiff returned to work at this site in 1973 to 1979 as a heating specialist for the Air Force, where he worked with insulation while doing service and repair work. (*See* Ex. 3, Work History of Glenn Frericks.)

6.      Based on Plaintiff's work history, Defendants reasonably anticipate that Plaintiff's claims against them, at least in part, will arise out of Plaintiff's alleged work with or around asbestos-containing products at the GFAFB.

7.     The GFAFB is owned by the United States Air Force.  Construction of the GFAFB began in September 1955 and the base became operational in 1957.  (*See* Ex. 4, Article re: History of Grand Forks Air Force Base.)

8.     The base began as a fighter interceptor base for the Air Defense Command, and was quickly transferred to the Strategic Air Command and then became the home of the 319th Bombardment Wing.  (*See id.*)  The 319th flew B-52's and KC-135's from GFAFB, conducting "global bombardment training and air refueling operations to meet Strategic Air Command (SAC) commitments."  (Ex. 5, 319 Air Base Wing (ACC) Fact Sheet, Air Force Historical Research Agency (February 12, 2018) https://www.afhra.af.mil/About-Us/Fact-Sheets/Display/Article/432402/319-air-base-wing-amc.)  The base was one of several in North Dakota that was part of the Air Force's plan to disperse its B-52 bombers across numerous bases and make it more likely that some portion of its B-52 fleet would survive a first strike from the Soviet Union.  (Ex. 6, Strategic Air Command Fact Sheet, National Museum of the US Air Force (June 1, 2015), https://www.nationalmuseum.af.mil/Visit/Museum-Exhibits/Fact-Sheets/Display/Article/197645/strategic-air-command.)

9.     Pursuant to military construction appropriations laws, the U.S. Government has authorized the Secretary of the Air Force to establish and develop military installations and facilities by acquiring, constructing, converting, rehabilitating, or installing permanent or temporary public works for numerous military installation projects, including the GFAFB. More specifically, at all times relevant to the instant lawsuit, the Secretary of the Air Force was authorized to construct maintenance facilities, supply facilities, hospital facilities, troop housing, community facilities, and utilities at the GFAFB.  The Secretary was also authorized to construct family housing units for occupancy as public quarters at the GFAFB.  The authority to place

permanent and temporary structures for military installations includes the authority for surveys, administration, overhead, planning and supervision incident to construction.  As relevant here, contracts for military construction projects were to be executed under the jurisdiction and supervision of the Corps of Engineers, Department of the Army or the Bureau of the Yards and Docks, or Department of the Navy, unless the Secretary of Defense determined that supervision of the contracts should be executed under the jurisdiction and supervision of another Government agency.  (*See* Ex. 7, Public Law 161; Ex. 8, Public Law 85-685, Aug. 20, 1958; Ex. 9, Public Law 87-554, July 27, 1962.)

10.     The award of contracts and supervision of construction for the GFAFB was assigned to the Missouri Division of the Corps of Engineers, acting as construction agents for the United States Air Force. The Army Corps of Engineers was responsible for the award of construction contracts at the GFAFB. (Ex. 10, July 23, 1956 Article from Lincoln Star Journal.)

11.     Plaintiff's claims against Defendants arise out of their work as government contractors at the GFAFB, where Defendants allegedly supplied and installed insulation for various insulation jobs that occurred during the time periods relevant to this lawsuit. The insulation work that Defendants performed at air force bases, including GFAFB, was governed by detailed specifications, including specifications governing the products that were permitted for use on the projects.  (Ex. 11, Deposition of William Sornsin, 6/30/1987, pp. 32-33; Ex. 12, Deposition of William Sornsin, 9/28/1983, p. 53.)

12.     More specifically, the Army Corps of Engineers, on behalf of the United States Air Force, promulgated specifications that governed construction at the GFAFB, including Defendants' insulation work at the GFAFB.   The Corps of Engineers specified the use of asbestos and/or asbestos-containing insulation products for Defendants' insulation work at the

GFAFB, and would reject the use of any products that did not meet the specifications, including products that did not meet specifications regarding the asbestos content of such insulation products. Government inspectors were on-site daily during construction projects at the GFAFB, and the government inspectors would inspect the work that the insulation contractors performed at the site. The government inspectors would inspect how Defendants were doing their work and whether Defendants were using the products that were specified by the Corps of Engineers on behalf of the United States Air Force, pursuant to its detailed specifications. *See* Ex. 11 at 8, 22–23; Ex. 13, Deposition of Andrew I. Olerud, Jr., 1/18/1983, pp. 98-99, 110-118; Ex. 14, Deposition of Andrew I. Olerud, Jr. 12/05/1991, pp. 14-21, 71-72; Ex. 15, Deposition of J. Nodsle, 1/25/1983, pp. 109-120; Ex. 16, Deposition of James Matthews, 3/23/1982 (Vol. 1), pp. 39-40, 83-88; Ex. 17, Deposition of James Matthews, 3/24/1982 (Vol. 2), at pp. 209-211; Ex. 18, Deposition of Rudolph Opp, 10/15/1991, pp. 14-20; Ex. 19, Deposition of Rudolph Opp, 7/18/1994, pp. 189-190; Ex. 20, Deposition of Bruce Bergson, 7/18/2000, pp. 65-68; Ex. 21, Declaration of Kyle Dotson, ¶ 11.

13.    Department of Defense specifications for a high-temperature insulating cement, which required the cement include asbestos fibers, had no requirement that the product be accompanied by a warning at the time of Defendants' work at the base. (*See* Ex. 22, MilSpec-C-28610, Military Specification: Cement, Insulation, High Temperature.)  More importantly, the specifications require compliance with a separate military standard regarding markings, MIL-STD-129.  (*See id.* at 4.)  MIL-STD-129 includes detailed specifications regarding every aspect of product markings.  (*See* Ex. 23, Military Standard Marking for Shipment and Storage, MIL-STD-129C (July 11, 1960), at iii-v).  MIL-STD-129 governs the "marking of military supplies

and equipment for shipment and storage." (*Id.* at 1.)  No unauthorized warnings are allowed.[1] (*Id.* at 8 ("No markings, other than those specified in this standard, or authorized by the cognizant activity concerned, or those required by regulation or statute, shall be placed on any container, except as permitted in 4.2.1.1.")).  Not only does MIL-STD-129 *not* require any asbestos-related warnings, the standard *does* require warnings for other potentially hazardous materials.  (*See id.* at 13, 24 & 67 (requiring markings for radioactive material, including "DANGER" and "Caution: Radioactive materials."); Ex. 24, Military Standard Marking for Shipment and Storage, MIL-STD-129C Change Notice 1 (Feb. 10, 1961), at 13-14 (adding more detailed specifications regarding marking radioactive materials); Ex. 25, Military Standard Marking for Shipment and Storage, MIL-STD-129C Change Notice 3 (Aug. 28, 1964), at 14a (governing the warning labels to be included for hazardous chemicals)).  MIL-STD-129 also requires caution labels of packages containing magnetic equipment, including a warning that packages containing magnetic material packaged for air travel must be at least seven feet away from compass sensing devices.  (Ex. 23 at 24.)

14.     Some of the products used at GFAFB were specifically formulated for military use. For example, one of the products used at GFAFB during construction in 1959 was Keene Super Powerhouse Cement. *See* Ex. 14, at 21–22; Ex. 26, Deposition of Andrew I. Olerud, Jr., 02/21/1991, pp. 87-88 (stating that the Keene cement he used on the job was "government inspected for that type of a job").  Although Keene Corporation manufactured a non-asbestos version of this product for non-military use, it manufactured an asbestos-containing formulation

---

[1] While Part 4.2.1.1 allows advertising matter and case-level markings that do not interfere with the required markings, there is no exception permitting warning markings not required by MIL-STD-129.  *See id.*

Cognizant activity is defined as either the contracting officer, for marking at the contractor's facilities; or the head of the bureau of service responsible for storage and shipment, for marking at installation.  *Id.* at 4.

in conformance with government specifications, exclusively for the use of the military. Ex. 27, Keene Corporation's Response to Plaintiff's First Set of Interrogatories in *In re: North Dakota Personal Injury Asbestos Litigation No. I*, (D. N.D., May 24, 1990), pp. 15-16; *see also* Ex. 28, Keene Corporation's Response to Plaintiff's Interrogatories and Request for Production of Documents, Set I *In re: Minnesota Personal Injury Asbestos Cases*, (D. Minn. Apr. 13, 1989), pp. 15-16.

15.     At all times relevant, the U.S. Government had knowledge of the hazards of asbestos that was superior to that of insulation contractors such as Defendants.  (*See generally* Ex. 21 at ¶ 12; *see also* Ex. 12, at 75–79).

16.     All packaging/bags of raw asbestos were provided with warning labels by Johns Manville by early 1969, while cements had been labeled in 1966 and finished pipe insulation was labeled earlier in 1964.  Pre-OSHA voluntary labels were first placed on asbestos-containing insulation products in 1964, cement used by insulators had warning labels in 1966, and various types of bag and all other bulk bag packaging of raw asbestos had warning labels in the US by 1968 or 1969. (See Ex. 21, ¶¶ 8–9.) Warnings were provided earlier by the U.S. military.  (*Id.*)

## II.     FEDERAL OFFICER REMOVAL JURISDICTION: APPLICATION OF SECTION 1442(A)(A) TO THIS CASE

17.     As provided by § 1442(a)(1), a civil action that is commenced in state court against, or directed to, "any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or related to any act under color of such office" may be removed "to the district court of the United States for the district and division embracing the place where it is pending."  28 U.S.C. § 1442(a)(1).

18.     More specifically, § 1442(a)(1) provides a private party with the right to remove to federal court where it is sued for actions taken under the direction of a federal officer.  The

right of removal conferred by § 1442(a)(1) is to be broadly construed, and thus "[t]he Supreme Court has explicitly endorsed a broad reading of § 1442 rather than 'a narrow, grudging interpretation.'" *Ferrell v. Yarberry*, 848 F. Supp. 121, 122 (E.D. Ark. 1994) (quoting *Arizona v. Manypenny*, 451 U.S. 232 (1981)).  *See also Nationwide Investors v. Miller*, 793 F.2d 1044, 1045-46 (9th Cir. 1986) (per curiam) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)); *Hardge-Harris v. Pleban*, 741 F. Supp. 764, 771 (E.D. Mo. 1990); *see also Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571, 576 (4th Cir. 1989); *Swett v. Schenk*, 792 F.2d 1447, 1450 (9th Cir. 1986) (same); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (same); *514 Citizens & Taxpayers v. Fecteau*, 269 F. Supp. 769, 770 (D.N.H. 1966) ("In order to effectuate the purpose of this statute, it must be liberally construed").

19.    Underlying this broad application of section 1442(a)(1) is a concern "that state court suits against . . . corporations [acting under the direction of federal officers] could disrupt the execution of federal law." *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992); *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 487 (1st Cir. 1989) ("Section 1442(a)(1) represent[s] a legislatively-spawned value judgment that a federal forum should be available when particular litigation implicates a cognizable federal interest.").

20.    Jurisdiction exists under § 1442(a)(1) when the following factors are met: the removing defendant is a "person" within the meaning of the statute; a causal nexus exists between the removing defendant's actions, taken pursuant to a federal officer's directions and under color of federal office, and the plaintiff's claims; and the removing defendant can state a

"colorable federal defense" to one or more of the claims stated against it.[2] *See, e.g.*, *Mesa v. California*, 489 U.S. 121, 124-25, 134-35 (1989).

21.     Defendants are corporations and therefore "person[s]" within the meaning of 28 U.S.C. § 1442(a)(1). *See, e.g.*, *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016); *Leite v. Crane Co.*, 749 F.3d 1117, 1122, n.4 (9th Cir. 2014); *Ruppel*, 701 F.3d at 1181; *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135-36 (2d Cir. 2008).

22.     To satisfy the "acting under" prong, the removing party must generally show that the federal official exercised "'direct and detailed control' over the defendant." *Fung*, 816 F. Supp. at 572 (citation omitted).   Such "control" can be "satisfied by strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'" *Id.* (citation omitted). Although merely "participat[ing] in a regulated industry" is typically not sufficient, courts have permitted removal where the defendants were "governed by 'exceedingly complex regulations, guidelines, and evaluation schemes.'" *Id.* (quoting *Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841 (S.D.N.Y. 1973)); *see also In re Agent Orange Prod. Liab. Litig.*, 304 F. Supp. 2d

---

[2] "[I]f one claim cognizable under [§ 1442(a)(1)] is present, the entire action is removed, regardless of the relationship between the [§ 1442(a)(1)] claim and the nonremovable claims." *National Audubon Soc'y v. Department of Water & Power*, 496 F. Supp. 499, 507, 509 (E.D. Cal. 1980); *see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012). Further, the court has supplemental jurisdiction over all other claims that are not subject to 28 U.S.C. § 1442(a)(1) by virtue of 28 U.S.C. § 1367(a), which states: "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

442, 447 (E.D.N.Y. 2004) (removal proper where government has exercised "substantial degree of direct and detailed federal control").

23.     Defendants have satisfied the "acting under" prong because, in all relevant aspects of their supply and installation of insulation products at the GFAFB, Defendants were acting under the detailed direction and control of one or more federal officers regarding the use of asbestos-containing products. More specifically, such insulation materials used in Defendants' work were specified by specifications that were promulgated by the U.S. Air Force and/or Corps of Engineers and which specified the use of asbestos-containing thermal insulation materials. Notably, the U.S. Air Force and/or Corps of Engineers required the use of such asbestos-containing products despite the fact that the U.S. Government, at all times relevant to this case, had superior knowledge regarding asbestos-related health hazards.

24.     In sum, no material aspect of the construction process, including Defendants' insulation work, escaped the close control of the Corps of Engineers and/or the U.S. Air Force and its officers, who retained final authority in all such regard.  Therefore, Defendants were "acting under a federal officer" in their work at the GFAFB. *See, e.g.*, *Ruppel*, 701 F.3d at 1181; *French v. A.W. Chesterton Co.*, 2016 WL 6649281 at *3 (N.D. Ohio Nov. 10, 2016); *Commardelle v. Pennsylvania General Ins. Co.*, 2014 WL 1117969 at *3-4 (E.D. La. Mar. 28, 2014); *Najolia v. Northrop Grumman Ship Sys.*, 883 F. Supp. 2d 646, 653-54 (E.D. La. 2012); *Pack v. ACandS, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993); *Fung*, 816 F. Supp. at 572.

25.     Because Defendants have been sued for asbestos-related injuries purportedly arising from or relating to asbestos-containing products that they allegedly supplied to and/or installed at the GFAFB under the U.S. Government's detailed direction and control, Defendants have been sued in relation to conduct under color of its federal office, satisfying the "causal

nexus" requirement. *Madden v. Able Supply Company*, 205 F. Supp. 2d 695, 701-02 (S.D. Tex. 2002). Accordingly, the "causal nexus" standard is satisfied as to asbestos-related injury claims involving Defendants' alleged supply of and/or use of asbestos at the GFAFB. *See Ruppel*, 701 F.3d at 1181; *French*, 2016 WL 6649281 at *4; *Laurent v. City of New Orleans*, 2014 WL 5410654 at *3 (E.D. La. Oct. 23, 2014); *Shepherd v. Air & Liquid Systems Corp.*, 2012 WL 5874781 at *8-9 (D. R.I. November 20, 2012); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, 2012 WL 3155180 at *8 (E.D. Pa. Aug. 2, 2012); *Kite v. Bill Vann Company, Inc.*, 2011 WL 4499345 at *4 (S.D. Ala. 2011); *Dupre v. Todd Shipyards Corp.*, 2011 WL 4551439 at *6 (E.D. La. Sept. 29, 2011); *Ellis v. Pneumo Abex Corp.*, 798 F. Supp. 2d 985, 990 (C.D. Ill. 2011); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1334-35 (N.D. Ala. 2010); *Allen v. CBS Corporation*, 2009 WL 4730747 at *2-3 (D. Conn. Dec. 1, 2009); *Mitchell v. AC&S, Inc.*, 2004 WL 3831228 at *5 (E.D. Va. Dec. 15, 2004); *Madden*, 205 F. Supp. 2d at 701-02.

26.     As to the question of a colorable federal defense, Defendants hereby assert a government contractor defense pursuant to *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). A federal contractor cannot be held liable for a state tort if, in the context of the work at issue: (1) the United States approved reasonably precise specifications; (2) the work conformed to those specifications; and (3) the contractor warned the United States about the dangers in the use of the product that were known to the supplier but not to the United States. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016). Therefore, Defendants can, accordingly, state at least a colorable government contractor defense in relation to such claims, because (1) to the extent Defendants supplied and/or installed asbestos-containing insulation products, such products were supplied and/or installed in accordance with "reasonably precise specifications" promulgated or heedfully approved and adopted by the Corps of Engineers on behalf of the U.S.

13

Air Force; (2) the products supplied and/or installed by Defendants, and their work at the site conformed with those specifications; and (3) at all times relevant to this suit, the U.S. Government was independently aware of and had superior knowledge of the potential health hazards associated with asbestos exposure and Defendants did not know about the potential health hazards associated with asbestos exposure that were not known to the U.S. Government. *See, e.g.*, *id.* at 814 (removal proper where government had a superior understanding of the risks of asbestos); *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 784 (E.D. Pa. 2010) ("The defense does not require the contractor to warn the government of hazards where "the government knew as much or more than the defendant contractor about the hazards of the . . . product.").

27.   The fact that the government was already fully aware of the hazards of asbestos satisfies this element of the government contractor defense.  *Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 2018 (S.D. Ill. 1989) (U.S. Air Force had superior knowledge of the hazards of asbestos so government contractor defense was applicable); *Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1216 (3d Cir.1989) (warnings to the government are not required when the government agency "knew as much or more" about the danger than the contractor); *Ramey v. Martin–Baker Aircraft Co. Ltd.*, 874 F.2d 946, 951 (4th Cir.1989) (federal contractor defense applied because the record revealed that the Navy already had "full knowledge of the danger").

28.   Here, the government specifications included detailed labeling specifications, including warnings specifications, which show the extensive control and discretion that the government exercised over the specifications Defendants were required to follow.  The level of government oversight, and its acceptance of both the products being applied and work being

14

performed by Defendants, including rejecting any non-conforming products or work, demonstrates that Defendants complied with all government specifications, including labeling and warning specifications. *See Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001); *Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 103 (D. Conn. 2007) (holding affidavit stating that "any materials supplied by a contractor that were not entirely consistent with the Navy's extensive specifications probably would have been rejected. From this, the inference can be drawn that if [plaintiff] was exposed to [defendant's] products while on board a Navy ship, that equipment fully complied with the Navy's detailed specifications concerning both design and warnings").

29.     The government contractor defense applies to both the design defect and failure to warn claims asserted by Plaintiff. *See, e.g., Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 814 n.6 (3d Cir. 2016); *See Caldwell v. Morpho Detection, Inc.*, No. 4:10-CV-1537 JAR, 2013 WL 500867 at *7 (E.D. Mo. Feb. 11, 2013); *Schmid v. Unisys Corp.* No. 4:95-CV-00864 LOD, 1996 WL 421843 at *17 (E.D. Mo. July 24, 1996).

30.     Similar to design defect claims, warning decisions by the government can conflict with state law warning requirements, and cause the type of conflict *Boyle* recognized as "present[ing] a 'significant conflict' with federal policy." *Boyle*, 487 F.3d at 1003; *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996) (noting that "similar policy considerations control both design defect and failure-to-warn situations" and *Boyle* can offer guidance in the failure-to-warn context). Because the government is not liable when it exercises a discretionary function, its contractors are also not liable when they carry out the discretionary decisions of the government because they are required to act in the manner decided upon by the government. *Id.* at 511-12, 108 S. Ct. at 2518; *see also Ripley v. Foster Wheeler LLC*, 841 F.3d

207, 211 (4th Cir. 2016) ("[T]he constitutional separation of the judiciary from military matters carries no less force with respect to the design of military equipment than it does with respect to the warnings accompanying such equipment."). Where the government exercises its discretion over the contractors' actions, the government has an interest in insulating its contractors from state law liability arising out of the contractor's actions. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995).

31.    In sum, and consistent with the short and plain statement of the law and facts offered herein, this Court has original jurisdiction over the subject matter of this suit under § 1442(a)(1) given that Defendants were acting under an officer or agency of the United States relative to one or more of the claims stated against them, and can state at least a colorable federal defense to said claim or claims.

## PROCEDURAL REQUIREMENTS

32.    Defendants offer this statement to satisfy their obligation removing defendants under § 1446(a) to provide a short and plain statement of the legal and factual basis for removal. Defendants reserve the right, and request an opportunity, to respond more fully in writing to any motion for remand in this case, and to supplement the record with affidavits, declarations, and/or evidence supporting the assertions of fact stated herein.

33.    A notice of removal must be filed within thirty days of the defendants' receipt of the initial pleading or, "[i]f the case stated by the initial pleading is not removable," within thirty days of the defendant's receipt of "an amended pleading, motion, order or other paper from which it may be ascertained that the case is one which is or has become removable[.]" 28 U.S.C. § 1446(b)(3). This notice of removal is timely because it is filed within thirty (30) days of the disclosure of Plaintiff's work history on April 5, 2022, where Plaintiff, for the first time, alleged

that he was exposed to asbestos-containing products at the Grand Forks Air Force Base, where Defendants allegedly supplied and installed insulation materials.

34.     Removal is proper as one or more of the claims stated against Defendants falls within the jurisdictional scope of § 1442(a)(1) and as removal has been affected within thirty days of Defendants' first notice that the case is removable.

35.     Defendants have no duty to notify in advance, or obtain the consent of, any other defendant to this action in order to remove this case under § 1442 (a)(1). *See, e.g.*, *Humphries v. Elliott Co.*, 760 F.3d 414, 417 (5th Cir. 2014); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Ely Valley Mines v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

36.     In compliance with 28 U.S.C. § 1446(d), Defendants will promptly provide written notice of this Notice of Removal to all adverse parties, and, promptly after the filing of this Notice of Removal, will file a copy thereof with the Clerk of the Cass County District Court, East Central Judicial District, State of North Dakota.

37.     Pursuant to 28 U.S.C. § 1446(a), Defendants have filed a copy of all process, pleadings, and all other documents filed in the state court proceeding, which are attached to the Affidavit of Heather H. Neubauer, filed contemporaneously with this Notice of Removal.

38.     By filing this Notice of Removal, Defendants do not waive any of their affirmative defenses, including but not limited to their right to move to dismiss for lack of personal jurisdiction, improper process, improper service of process, improper venue, failure to state a claim upon which relief can be granted, or failure to join all necessary parties.

WHEREFORE, Defendants remove this action from the District Court for Cass County, East Central Judicial District, State of North Dakota, to the United States District Court for the District of North Dakota, and that all further proceedings in this action be held before this Court.

**MEAGHER + GEER, P.L.L.P.**

Dated:  May 4, 2022            By:  */s/ Heather H. Neubauer*
                                                Heather H. Neubauer (#06638)
                                                Meagher + Geer P.L.L.P.
                                                33 South Sixth Street, Suite 4400
                                                Minneapolis, MN  55402
                                                (612) 338-0661
                                                hneubauer@meagher.com

                                                *ATTORNEY FOR DEFENDANT BUILDING SPRINKLER COMPANY, INC.*

**FOLEY & MANSFIELD, PLLP**

Dated:  May 4, 2022            By:  */s/ Elizabeth M. Sorenson Brotten*
                                                Elizabeth M. Sorenson Brotten (#06521)
                                                250 Marquette Ave. S. #1200
                                                Minneapolis, MN  55401
                                                (612) 338-8788
                                                ebrotten@foleymansfield.com

                                                *ATTORNEY FOR DEFENDANT A.H. BENNETT COMPANY*

15153209.1

**United States District Court, East Central Judicial District
State of North Dakota, County of Cass**

| | |
|---|---|
| Glenn W. Frericks,<br><br>              Plaintiff,<br>v.<br><br>A. H. Bennett Company, a Minnesota corporation, et al.,<br><br>              Defendants. | Civil No.: 09-2021-CV-02414<br><br>**DECLARATION OF KYLE DOTSON IN SUPPORT OF NOTICE OF REMOVAL** |

I, Kyle Dotson, pursuant to 28 U.S.C. §1746, hereby declare and state as follows:

1.  I am over the age of eighteen years and am not a party to this action.  I make this declaration in support of the notice of removal filed in the above-entitled action.  The information contained herein is of my own personal knowledge and if called upon as a witness I could and would competently testify thereto.

2. I base the opinions contained herein on my education, training, background and my professional experience and knowledge of recognizing, evaluating and controlling occupational exposures to many different substances, including but not limited to the asbestos minerals.

3. I am President of the Dotson Group, LLC, a safety and industrial hygiene services firm located in Scottsdale, CA.  I received my Bachelor of Science in Natural Science from McMurry University in Abilene, Texas in 1979 and my Master of Science in Environmental Science from the University of Texas at Dallas in 1987.  I have been a Certified Industrial Hygienist since 1987. I have been a Certified Safety Professional

since 1986 and a Board Certified Environmental Engineer since 2000. I have served on the Board of Directors of the American Industrial Hygiene Association ("AIHA") and the Board of Trustees for the American Industrial Hygiene Foundation. I am a member of the American Conference of Governmental Industrial Hygienists ("ACGIH"), a Diplomate and in the past on the Nominating Committee with the American Academy of Industrial Hygiene, Member and former Vice President of the Southwest chapter of the American Society of Safety Engineers, and in the past served on the Board of Directors of the Texas chapter of the National Asbestos Council.

4. I have over 40 years of experience in industrial hygiene, having been employed by Phelps Dodge, Northern Telecom, Calpine Corporation, BHP Limited, Maxim Environmental/Engineers, Inc., Aetna Life & Casualty, Hartford Insurance Group, and most recently numerous consulting clients. My curriculum vitae, which more fully sets forth my qualifications, credentials, publications and experience is attached hereto as **Exhibit A**.

5. I have been qualified as an expert on industrial hygiene matters and have provided trial and deposition testimonies on numerous occasions on the topics of industrial hygiene, occupational exposures, asbestos state of the art, and the risk of disease.

6. Industrial hygiene is an essential element of public health. It is proactive and preventive in nature. A paradigm of industrial hygiene is the anticipation, recognition, evaluation, and control of health risks from chemical, biological, and physical hazards in the workplace. The standards, practices, and customs of general industrial hygiene are applied consistent with other scientific fields of study.

7.  The knowledge of the US Government regarding the hazards of asbestos can be characterized by the early studies of insulators by the US Navy and Maritime Commission (Fleischer Drinker, 1946), the asbestos exposure control programs of US Government facilities such as the Puget Sound Naval Shipyard (PSNS) starting in the early 1940s, actions by the US General Services Administration as noted in various documents in the early 1960s, Walsh Healy standards[1] and the US Department of Labor Occupational Health and Safety Administration as of 1970.

8.  The US Government had programs in place as early as 1941, based upon the Deposition of Daniel Bessmer dated 6/10/1982, 5/31/1983 and 6/1/1983; Deposition of Roger Beckett dated 4/23/1982 and 8/3/1982; Deposition of Carl Mangold dated 12/2/2004 and 12/3/2004; Affidavit of Roger B. Horne, Jr., RADM USN (Ret.); and Affidavit of John B. Padgett, III, RADM USN (Ret.). Below is a summary of the knowledge of the US Government military as represented by the Navy.

*Professional Staff, Management Organization, and Navy Control at PSNS*

•       Daniel Bessmer said the Navy first implemented IH programs at the Puget Sound Naval Shipyard (PSNS) in late 1941 or 1942. Daniel Bessmer first began taking asbestos air samples after he arrived at PSNS (1949).

•       Daniel Bessmer said by the late 1960s/early 1970s that the asbestos program at PSNS was known as a "model program for asbestos dust control."

•       Daniel Bessmer said Navy production officers had control over what H&S programs were instituted at PSNS.

---

[1] Safety and Health Standards. For Contractors performing Federal Supply Contracts under the Walsh-Healey Public Contracts Act. US Government Printing Office. Document No.: 921345. April 24, 1951. In 1951, the Walsh Healey Public Contracts Act was expanded to include Safety and Health Standards that recommended a list of 29 ACGIH TLVs, to be used "as a guide for allowable concentrations." This was the first specific Federal regulatory standard that expanded upon the generic requirements (for ventilation and respirators where appropriate) contained within the Basic Safety and Health Requirements added in 1942 to the original Walsh Healey Public Contracts Act of 1936.

- Carl Mangold worked at PSNS from 1962 to 1972. Carl Mangold said he created an organizational chart identifying duties and responsibilities for asbestos safety, by level of position at PSNS.

*Use of Asbestos-Containing Materials (ACM) at PSNS*

- Carl Mangold said the shipyard worked with "hundreds of tons" of asbestos yearly. Daniel Bessmer said the manner in which ACM was used at PSNS was the same manner that ACM was used at other Navy shipyards.

- Carl Mangold said Navy mil-specs required insulation cement to contain 60-85% chrysotile asbestos. Mil-Specs continued to require the use of asbestos half rounds up until 1970 for high temperature insulation.

*Exposure Sampling*

- Daniel Bessmer said that dust control systems in place in 1949 in shop 56 included ventilation and wet-down methods, but in the 1950s when Daniel Bessmer initially did sampling, the dust counts were below the MAC so respirator usage was not needed.

- In 1963, Roger Beckett instituted the new PCM membrane dust-counting technique for use at the shipyard when sampling asbestos and other air contaminants.

- Daniel Bessmer said the result of reports he and Roger Beckett and Carl Mangold published in 1968 and in 1970 both reported that asbestos exposures of shipyard workers were intermittent and largely at levels below the TLV.

- Roger Beckett said of the many asbestos samples they took at PSNS from 1975 to 1979 that exceedances were "special cases" and out of the norm.

*Respiratory Protection*

- Daniel Bessmer said the Navy was providing insulators with respirators in the 1940s and that PSNS stocked MSA double canister respirators (Protection Factor 10X) in the tool room and these were available to insulators who asked to use one. Daniel Bessmer said in the 1950s at PSNS there were respirators available for worker to check

4

out from tool rooms and that respirators were used occasionally at PSNS during the 1950s. Daniel Bessmer said as early as 1952 PSNS had a safety manual and in that manual shipyard workers were instructed to use respirators when working in dusty conditions and that respirators could be acquired from tool rooms (air-fed respirators also became available in 1952). Roger Beckett said "dust respirators have been required for installation or rip-out aboard ships since 1956" as stated in his report in 1968. Roger Beckett said that PSNS had a respirator program in place since 1960, but this control program instituted in the latter 1960s included the "enforcement" of respirator usage – making it a shipyard policy. Roger Beckett said that respirators were first issued to insulators at PSNS in the early 1950s, and were required to be used in 1960 (but it was not enforced until the latter 1960s). Daniel Bessmer said prior to 1968 at PSNS respirator usage was not mandatory for use by insulators. Daniel Bessmer said that respirator usage became mandatory at PSNS in 1966 for insulators – but such usage was not strictly enforced by supervisors. Carl Mangold said in 1967 about 50% of insulators were regularly using respirators and compliance with respirator usage continued to grow as IH put on more pressure for usage, as more education was provided to insulators, and as the entire asbestos control program was being implemented in the mid to late 1960s. Carl Mangold said that in 1967 many insulators were not using respirators but most likely an insulator would be using a respirator by 1969 or 1970. Roger Beckett said the protection provided by respirators in the 1975 to 1979 timeframe had Protection Factors of 10X of the exposure limit and were NIOSH approved.

*Exposure Controls (other than Respiratory Protection)*

•       Daniel Bessmer said that in 1949 asbestos workers were receiving periodic chest x-rays (initially every 6-months, then later reduced to annual x-rays). Daniel Bessmer said that in 1949 PSNS was using ventilation methods to address dust issues when cutting ACM in shop 56 where insulators cut and fabricated insulation. Also in shop 56 wet-down methods were being used for sweeping up the shop (prior to his arrival

in '49) but that at that time wet-down methods were not often used on ships themselves. Wet-down methods for sweeping up insulation debris and when cutting insulation were in place at PSNS since the early 1950s. Daniel Bessmer said increased ventilation was approved after PSNS became aware of the Marr findings. Carl Mangold said some controls were instituted in the latter 1960s, prior to release of the asbestos control program in 1970. Controls in the latter 1960s included providing insulators with disposable clothing that were thrown away at the end of the job, a strong respiratory protection program that included specific types of respirator for specific jobs and ease of access to respirators . Also implemented in the latter 1960s were temporary ventilation systems used at the point of work. Also implemented in the latter 1960s was the use of vacuum cleaners as an exhaust tool and for cleanup, and the use of plastic bags attached to the edge of tables where cutting occurred (dust captured via a down draft system) to greatly reduce cleanup needs. Other controls included cutting insulation in the shop equipped with the proper ventilation, and not on ships, keeping asbestos storage areas scrupulously clean, and switching to preformed gaskets that reduced the cutting of gaskets from sheet material. Also they improved cutting methods of amosite cloth that eliminated most of the residue that was created, and installed exhaust systems on bandsaws used to cut half rounds in shop 56. They relocated and improved the building where ACM was stored at the shipyard, resulting in better inventory. All of these control systems were in place by 1968/1969. Roger Beckett said PSNS instated a 4-point asbestos-related program between 1967 and 1969. The 4 areas that were addressed included the respirator control program, a wet-down procedure, substitution of ACM with non-ACM materials, and employee awareness training of asbestos hazards. In the timeframe of 1968-70, Roger Beckett said although elements of dust-control programs were in effect, they still had a few exceedances of the TLV. Roger Beckett said by 1970 PSNS began using vacuum cleaners to clean up after ACM work, and tenting was installed around areas where ACM work took place at the shipyard.

6

*Industrial Hygiene Communications Among Shipyards*

•      Daniel Bessmer said one of his first actions an IH at PSNS in 1949 was to conduct an industrial hygiene survey at the Mare Island shipyard, and then worked at the New York Naval Shipyard for 6-months. In 1946 he went to the Naval Air Station in San Diego as an IH Officer.

•      The Navy had a process whereby industrial hygienist in various shipyards were able to communicate IH work/progress being conducted at shipyards – such that all shipyards were aware of advances being made in industrial hygiene at other shipyards.

•      Daniel Bessmer said the Bureau of Medicine published articles quarterly and Daniel Bessmer received these publications (since the '50s) relating to occupational health issues, and these articles shared IH information from various shipyards.

•      Daniel Bessmer started up the Naval Industrial Hygiene Association in the 1960s, as a forum for Naval industrial hygienist to share information and technical papers.

•      Roger Beckett said other Naval shipyards began to inquire PSNS about the asbestos control methods being implemented at PSNS in the late 1960s and early 1970s (including Long Beach and Philadelphia).

•      Roger Beckett was a member of the Naval and Industrial Hygiene Association (the first forum created for exchange of information between Navy industrial hygienists) when it was formed in the mid to late 1960s, the ACGIH, and the local section of the American Industrial Hygiene Association.

•      Daniel Bessmer said that in 1969 or 1970 a team from Mount Sinai Hospital in NY visited PSNS to benchmark the shipyard's asbestos control program, and the team stated the PSNS asbestos program "was the best shipyard asbestos control program that they had observed in this country and Europe."

•       Carl Mangold said in 1971, Naval Command in Washington, DC sent out to every Naval facility across the world mandating requirements to be put in place with respect to asbestos control.

*Health Studies at PSNS*

•       Once Daniel Bessmer read the study performed by Marr in Long Beach Daniel Bessmer said he initiated a similar study at PSNS. Daniel Bessmer tabulated the results of this study in 1965.

•       In 1965 PSNS embarked on a 2 ½ -year study of chest x-rays of shipyard production workers. The report was published in 1968. This survey was conducted by Dr. Frank (of medical records of PSNS employees) between 1965 and 1968 entitled "Incidence of Diagnosed Pulmonary Fibrosis."

•       Roger Beckett participated in a study beginning in 1968 that spanned 2+ years, to identify levels of asbestos exposure specific various work performed by PSNS – including ship overhauls, shop fabrication and new ship construction. In 1970 Roger Beckett prepared a report summarizing his findings, which reported sampling results for asbestos and many other air contaminants.

•       Carl Mangold authored the "Asbestos Exposure and Control" document for PSNS. He said from 1962 to 1964 they were identifying areas of asbestos concern at PSNS (exposures of insulators, pipefitters, and machinists) and in 1964 they began developing recommendations to address the concerns. The document was approved by the shipyard commander for implementation in 1970.

•       Roger Beckett published in 1973 a paper entitled "Asbestos Exposure Control at PSNS."

•       Roger Beckett published in 1978 a study titled "Asbestos Exposure from Gasket Operations."

- In 1981, Roger Beckett prepared a document as an IH at PSNS in response to a request from the Department of Labor – Office of Workers Compensation Programs, specific to shipyards.

*Training*

- Daniel Bessmer said that asbestos concerns were being communicated to employees of PSNS as early as 1949.

- Daniel Bessmer said in 1950 he began advising insulators to wear respirators on the job – which he put in writing, and sent to the production officer and to the shop 56 supervisor.

- Daniel Bessmer said as early as 1952 PSNS had a safety manual and in that manual shipyard workers were instructed to use respirators when working in dusty conditions and that respirators could be acquired from tool rooms (air-fed respirators also became available in 1952).

- Shipyard memos from 1956 and 1963 exist regarding the need for meetings to discuss respiratory issues and asbestos-related issues of shipyard asbestos workers.

- Daniel Bessmer said PSNS allowed him to hire other resources into the IH department in 1962 and 1963 and they began training for insulators regarding respirator usage and asbestos health risks.

- Carl Mangold said supervisors received and were trained on a "Supervisor's Guide to Temporary Ventilation" so they could train their crews (1965).

- Carl Mangold said new insulators were being trained on asbestos safety when starting work at the shipyard (initiated in mid 1960s).

- In the mid to late 1960s PSNS implemented a program to encourage workers to use ventilation and/or wet-down methods when working with ACM.

- Daniel Bessmer said PSNS introduced a formal asbestos training program in 1969.

*Signage, Labels and Warnings*

• Daniel Bessmer said that the labeling program instated at PSNS was before the Navy mandate the labeling of all hazardous materials in shipyards. Daniel Bessmer said PSNS began printing and applying labels in 1952.

• Carl Mangold summarizes the hazardous material labeling system initiated at PSNS in 1954. In the early years ACM was labeled as a "toxic" material. The stickers had skull and crossbones on them. They placed bulletin boards around the shipyard with the stickers on them and the meaning of these warning stickers.

• Daniel Bessmer said in the late 1950s PSNS began putting warning labels on hazardous materials, including ACM. Regarding the labeling of ACM at PSNS – all warning labels on hazardous materials had the same warning. There were 6 types of labels. There was no "specific label" for asbestos. The hazard labels were placed on "thousands" of chemical products at PSNS. Daniel Bessmer said at some point (prior to 1963), labels placed on ACM had warnings specific to asbestos hazards and all ACM had these warning stickers installed.

• Carl Mangold said the shipyard updated their hazardous warning labels in 1964 that provided more specific information on asbestos warning labels.

• Carl Mangold said tool rooms had signage installed (beginning in 1965) that identified the type of respirator needed specific to the type of work with ACM.

• Carl Mangold said additional signage was put in place in the shipyard by 1969 that reminded employees that respirators were mandated.

Substitution of Asbestos Materials

• Roger Beckett said that in 1968 PSNS began research for substitutes for asbestos substitution materials, but that there was a delay in achieving this objective because at the time there were no substitutes available for pipe insulation that met Mil-Specs in 1968. Mil-Specs continued to require the use of asbestos half rounds up until 1970 for high temperature insulation.

- Per Navy mil-specs, asbestos half rounds were to be asbestos-free by 1/9/1973.

- Carl Mangold said in 1974 the Navy began making a concentrated effort to eliminate ACM, and asbestos was replaced with mineral wool in all insulation cements.

Awareness and Reliance on Scientific Literature

- In 1942 the Navy sent Daniel Bessmer to Columbia University for training as an IH where he learned that asbestos caused asbestosis.

- Daniel Bessmer said he acquired information that asbestos was linked to (lung) cancer in the late 1950s from the literature and reviewing asbestos claims.

- Roger Beckett said that asbestosis had been know about for a long time and that it was widely-accepted that asbestosis was connected to asbestos exposure but that mesothelioma was not known as a significant part of the risk of working with asbestos in the early 1960s.

- Roger Beckett said prior to 1963 PSNS recognized working with asbestos insulation materials was "hazardous duty."

- Daniel Bessmer said it was in 1964 or 1965 (maybe 1962) that he received information regarding asbestos in a report published by William Marr, an IH at the Long Beach Shipyard.

- Roger Beckett learned of the William Marr industrial hygiene study at Long Beach Shipyard when it was published by the AIHA journal in May 1964.

- Roger Beckett was aware of a study by the Bureau of Occupational Health and Safety (in the 1960s), that 20% of all deaths of asbestos workers was due to lung cancer – a rate 7 times higher than the rate in a normal population, and that other researchers have suggested that cigarette smoking roughly doubles the risk of cancer in the asbestos worker group.

- Daniel Bessmer said that the PSNS medical officers were familiar with the work of Dr. Selikoff and reviewed such articles.

11

*Affidavit of Roger B. Horne, Jr., RADM USN (Ret.)*

•       The MilSpecs for Navy equipment were drafted, approved and maintained by the Navy… to address shipboard equipment and materials requirements, and any changes to those specifications were made by the Navy.

•       Navy officers are responsible for supervising all civilian activities and for inspecting and verifying purchasing documents and receiving equipment and material to ensure the ship construction and repair in the private yard conforms to Navy specifications. The role of civilians both in Navy yards and in private yards was to carry out work in accordance with MilSpecs.

•       The Navy state-of-the-art medical knowledge of the health risk associated with asbestos dust evolved from as early as the 1920's. MilSpecs for technical manuals prior to 1957 did not mention warnings. Even when later revisions of the specification did mention warnings, it was the Navy's intent to include only warnings concerning how someone might be immediately physically injured by their actions or cause serious damage to equipment. It was also specifically noted that such warnings were to be used sparingly as was consistent with real need. These instructions were universally understood by the Navy not to include long-term health hazards such as those presented by asbestos. Even after the hazard of asbestos was more fully understood by the Navy beginning in the mid to late 1960s, the Navy did not require changes to the technical manuals. Instead, the Navy invoked effective internal instructions for the safe handling of asbestos. Until 1975, when it issued a policy aimed at eliminating the use of asbestos materials where possible, the Navy believed that it had instituted adequate controls to protect personnel working with or around asbestos materials.

*Affidavit of John B. Padgett, III, RADM USN (Ret.).*

•       Through contracts incorporating detailed military specifications ("MilSpecs"), the U.S. Navy directed all aspects of the design, manufacture, installation, maintenance, overhaul, written documentations and warnings associated … the

equipment and materials integrated into its ships; and that the Navy did not permit deviations from its contracts without specific written approval. Any deviation from MilSpecs requires specific and express written approval from the Navy. Therefore, if any materials, equipment, or parts contained asbestos on Navy vessels such materials, equipment or parts were used pursuant to, and mandated by, specific requirements of the Navy.

• The U.S. Navy directed all aspects of the design, manufacture, installation, maintenance, overhaul, written documentations and warnings associated with its U.S. Navy vessels. U.S. Navy Shipyards were under the control, supervision and Industrial Hygiene management of the U.S. Navy.

• The Navy was in full control of, and dictated, the type of work to be done, and the equipment or materials to be removed, replaced, or installed for all Navy military vessels. The Navy designated the specific model/type/manufacturer of equipment and products to be used and monitored compliance with its regulations. The Navy retains ultimate decision making authority with respect to its military vessels and platforms.

• The U.S. Navy Shipyard controls and directs the work through its' own employees.

• All contract work performed on Navy ships — from the manufacture of equipment and materials to actual ship assembly, maintenance and modernization — is performed in accordance with the MilSpecs and under the direct supervision of Navy personnel. The Navy employs military and civilian inspectors to ensure strict contractor compliance with its MilSpecs.

• The Navy had knowledge regarding the potential risks associated with exposure to asbestos and asbestos containing products and with this knowledge affirmatively addressed the issue of asbestos-related safety precautions. Rather than issue warnings for every single piece of equipment or material which might contain asbestos, the Navy evolved its MilSpecs, and operating and maintenance procedures to account for

the safety precautions it deemed appropriate, and it developed training and medical monitoring procedures to address potential health hazards. The Navy established its MilSpecs and operating and maintenance procedures to account for the safety precautions it deemed appropriate.

•       The Navy also conducted its own training, adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate in its measures dealing with asbestos. A 1950 General Safety Rules Manual issued by the Puget Sound Naval Shipyard ("PSNS") provided instructions for handling asbestos. A 1961 Marine Pipe Covering and Insulating Manual for PSNS similarly set forth "General Safety and Health Practices." The Naval Academy's The Human Machine, recognized and discussed occupational risks including dust disease.

•       Responsibility for safety, health and welfare of Navy personnel on Navy ships and in shipyards constructing and maintaining those ships rests with the Navy. In the context of products and components designed and supplied pursuant to the Navy's technical requirements, the Navy is the principal authority of risk assessment.

•       The U.S. Navy directed all aspects of the design, manufacture, installation, maintenance, overhaul, written documentations and warnings associated with its U.S. Navy vessels. U.S. Navy Shipyards were under the control, supervision and Industrial Hygiene management of the U.S. Navy. In the U.S. Naval Shipyards, such as PSNS, the Medical Department included industrial hygienists, who managed the industrial hygiene concerns, which included control of asbestos dust in the workplace, in the shipyard. Puget Sound Naval Shipyard maintained an active Industrial Hygiene program from at least 1949 forward.

*Warning Labels on Asbestos-Containing Materials by Manufacturers and US Navy*

The history of the labeling of asbestos containing insulation materials, up to and including the OSHA required label language in the 1970s, is contained within certain documents within the archives available at the Historical Johns Manville Asbestos

Records Collection – Asbestos Claims Research Facility.  Based upon my review of these Johns Manville internal memos and correspondence documents, all packaging/bags of raw asbestos were provided with warning labels by Johns Manville by early 1969 (cements had been labeled in 1966 and finished pipe insulation was labeled earlier in 1964).   In summary, pre-OSHA voluntary labels were first placed on asbestos-containing insulation products in 1964, cement used by insulators had warning labels in 1966, and various types of bag and all other bulk bag packaging of raw asbestos had warning labels in the US by 1968 or 1969.

Warnings were provided earlier by the US military as previously discussed within the Affidavits of Roger B. Horne, Jr., RADM USN (Ret.); and of John B. Padgett, III, RADM USN (Ret.).

_References Noted and Relied Upon by PSNS Professional Staff in PSNS Publications_

• Fleischer, W.E., F.J. Viles, R.L. Gade, and Philip Drinker: A Health Survey of Pipe Covering operations in constructing Naval vessels. J. Ind. Hyg. & Toxicol. 28: 9 (Jan 1946).

• Selikoff, I.J.; Churg, J., and Hammond, E.C.: Asbestos Exposure and Neoplasia. Journal of American Medical Association 188:22 (April) 1964.

• Keane, W.T., and Zavon, M.R.: Occupational Hazards of Pipe Insulators. Archives of Environmental Health 13:171 (August) 1966.

• Marr, W.T.: Asbestos Exposure During Naval Vessel Overhaul, Amer. Ind. Hyg. Assn. J. 25:264 (May-Jun 1964).

• Selikoff, I.J.; Churg, J., and Hammond, E:C.: The Occurrence of Asbestosis Among Insulation Workers in the United States. New York Academy Sci. 132:139 (December) 1965.

• Cooper, W.C.: Asbestos as a Hazard to Health, Archives of Environmental Health 15:285 (September) 1967.

- Balzer, J.L.: The Work Environment of Insulating Workers, American Industrial Hygiene Association Journal, Vol. 29, No. 3 (June) 1968.

- Balzer, J.L.: Industrial Hygiene for Insulation Workers; Journal of Occupational Medicine, Vol. 10, No. 1 (January) 1963.

- Lynch, J.R., and H.E. Ayer: Measurement of Asbestos Exposure, J. 0cc. Med. 10:21 (Jan 1968).

- U.S. Public Health Service Publication, #614, The Industrial Environment, It's Evaluation and Control - Counting and Sizing Airborne Dust, 1966.

- Standard Procedure for Sampling and Counting Dusts, adopted by the 5th annual meeting of the National Conference of AGCIH, American Industrial Hygiene Association Journal (Nov-Dec 1967).

- Kleinfeld, M., M.D., J. Messile, M.D., and Kooyman, M.D.: Mortality Experience in a group of asbestos workers, Arch Environ Health 15:i77 (Aug 1967).

- Tabershaw, I.R., Asbestos as an Environmental Hazard, Journal of Occupational Medicine, Vol. 10, No. l (January) 1968.

- Cralley, L.J., et al Research on Health Effects of Asbestosis, Journal of Occupational Medicine, Vol. 10, No. 1 (January) 1968.

- Lanza, A.J., and Goldberg, J.A.: Industrial Hygiene, p. 385, Oxford University Press, Inc., New York, N.Y. (1939).

- Hunter, D.: The Diseases of Occupations, p. 900, Little, Brown and Co., Boston, Mass (1955).

- Merewether, E.R.A.: Industrial Medicine and Hygiene, Vol. 3, p. 105, Butterworth and Co., Ltd. London, G.B. (1956).

- Committee on Threshold Limit Values: Documentation of Threshold Limit Values, revised edition, p. 15, American Conference of Governmental Industrial Hygienists, Cincinnati, Ohio (1966).

- Selikoff, I.J. M.D., Jacob Churg, M.D., and E.C. Hammond, DSC: Asbestos Exposure and Neoplasia, JAMA 188:22 (Apr 6, 1964).

- Beattie, J., and J.F. Knox: Studies of the mineral content and particle size distribution in the lungs of asbestos textile workers. From Davies, C.N.: Inhaled Particles and Vapors, p. 419, Pergamon Press, New York, N.Y. (1961).

- Threshold Limit Values of Airborne Contaminants, adopted by ACGIH for 1969, and intended changes.

9. <u>Summary of Standards Known by the US Government (through 1980s)</u>

- By 1942, the National Conference of Governmental Industrial Hygienists had published a list of standards recommended by various State industrial hygiene units. The most common exposure standard for asbestos of eight listed States was 5mppcf.

- In 1943, the Navy and Maritime Commission adopted Minimum Specifications for Safety and Industrial Health in Contract Shipyards.

- In 1946, the American Conference of Governmental Industrial Hygienists (ACGIH) published the first Maximum Allowable Concentrations (by 1948 known as Threshold Limit Values) for workplace exposures to a wide range of 144 materials. Included was a Time-Weighted Average exposure standard for Asbestos of 5 mppcf. Threshold Limit Values (TLVs) were intended at the time, and continue to be today, concentrations at which "nearly all workers can be employed for their entire working lifetime without adverse effect."

- In 1951, Walsh Healey Public Contracts Act was expanded to include Safety and Health Standards that recommended a list of 29 ACGIH TLVs, including the 5 mppcf Asbestos standard, to be used "as a guide for allowable concentrations." This was the first specific Federal regulatory standard for Asbestos that expanded upon the generic requirements (for ventilation and respirators where appropriate) contained within

17

the Basic Safety and Health Requirements added in 1942 to the original Walsh Healey Public Contracts Act of 1936.

•   In 1958, the AIHA published Hygienic Guides that included standards for 56 substances, including asbestos.   The AIHA adopted and supported the ACGIH TLV of 5mppcf as a protective standard.

•   In 1968, the ACGIH published a Notice of Intended Change for its asbestos Threshold Limit Value (TLV) with a proposal to reduce the standard to 2mppcf or 12f/cc as an eight-hour Time-Weighted Average (8hr-TWA).

•   In 1969, the Walsh Healey Public Contracts Act adopted the 1968 ACGIH TLVs, including the Notice of Intended Change for Asbestos of 2mppcf or 12f/cc 8hr-TWA.  Walsh Healey also included a standard for Tremolite of 5mppcf.

•   In 1970, the ACGIH published a Notice of Intended Change for its asbestos TLV with a proposal to reduce the standard to an 8hr-TWA of 5f/cc, including a "ceiling limit" of up to 10f/cc but for not more than 15 minutes each hour for up to 5 times daily.

•   In 1971, the US Department of Labor's newly-formed Occupational Safety and Health Administration (OSHA)  in April and May of 1971 published lists of construction and general industry Permissible Exposure Limits (PEL) that adopted and superseded the 1969 Walsh Healey standard for Asbestos. At this time the Walsh Healey standard for Tremolite of 5mppcf was deleted.

•   Also in 1971 (December 7), OSHA issued an Emergency Temporary Standard for asbestos of 5f/cc as an 8hr-TWA, including a "ceiling limit" of up to 10f/cc but for not more than 15 minutes each hour for up to 5 times daily.

•   In 1972, OSHA promulgated and published on June 7, 1972, a PEL of 5 f/cc as an 8hr-TWA, including a "ceiling limit" of up to 10f/cc but not for more than 15 minutes each hour for up to 5 times daily.  In addition to establishing acceptable concentrations of asbestos dust, certain methods of compliance were also established, including local exhaust ventilation on power tools and use of wet methods during such

tasks as removing asbestos from bags. Respirators were required for tasks such as spraying demolition or removing friable asbestos-containing materials, as well as the use of other personal protective equipment such as separate clothing systems. Sampling and exposure notification requirements, caution signs and labels, housekeeping, waste disposal bagging, and medical examination and recordkeeping were also required. The 1972 standard established that the asbestos PEL would be automatically reduced to 2 f/cc in 1976.

•       Also in 1972, the National Institute for Occupational Safety and Health (NIOSH) published a Recommended Exposure Limit (REL) of 2 f/cc 8hr-TWA with no exposures above 10f/cc.

•       In 1976, OSHA reduced its asbestos PEL to 2 f/cc as an 8hr-TWA.

•       Also in 1976, NIOSH published an REL of 0.1 f/cc 8hr-TWA.

•       In 1978, the ACGIH published a Notice of Intended Change for its asbestos TLV in 1978 and finalized it in 1980, thereby establishing separate TLVs for various asbestiform materials in recognition of their toxicological differences.  Published were four 8hr-TWA TLVs including Amosite 0.5f/cc, Chrysotile 2f/cc, Crocidolite 0.2f/cc, and Tremolite 0.5f/cc. These standards continued to exist until 1998.

•       In 1981, the ACGIH TLV for Tremolite was deleted.

•       In 1986, the OSHA asbestos PEL was reduced to 0.2 f/cc as an 8hr-TWA, with certain monitoring and other provisions required at an exposure level of half of the PEL.  A variety of new methods of compliance was required by OSHA including regulation by task rather than by industry of employer.

•       In 1988, an Excursion Limit of 1 f/cc for 30 minutes was established.

10. The First Major Study of Asbestos Insulators was Conducted by US Government

The first major study of asbestos insulators was in 1946, when Fleischer & Drinker and others associated with the US Navy, US Maritime Commission, and US Public Health Service published the first major study of insulator exposures to asbestos in Government Navy and Navy Contract shipyards.[2]

In 1938, a study by Dreessen of the US Public Health Service established the first airborne standard for asbestos dust.  The Dreessen study became the seminal document that provided the recommendation of the 5mppcf industrial hygiene standard for asbestos. This study of shipyard insulation workers provided strong scientific support for the existing 5mppcf asbestos standard as a safe level of exposure. It discussed the development of amosite pipe covering in the mid-1930's and described insulator work operations. The study noted an "extremely low" incidence of asbestosis, 0.29%, and since only 3 of 1074 had asbestosis and all had worked more than 20 years as a pipecoverer, "it would appear that asbestos pipe covering of naval vessels is a relatively safe occupation." In its conclusions, the study indicated that "pipe covering is not a dangerous occupation." In 1955, Doll published the landmark paper that associated lung cancer with asbestosis. From an industrial hygiene perspective, this paper simply confirmed the prevailing view that lung cancer was sometimes associated with, or was a complication of, asbestosis. Also in 1958, the second edition of Patty's Industrial Hygiene and Toxicology was published. The possibility of the length of the fibers as a key element of the disease had become important and it was noted that "if only long fibers cause the disease, (asbestosis and its possible complications such as lung cancer) fine dust respirators  are not necessary. The more comfortable gauze respirators  appear to be perfectly adequate filters for long fibers."   In 1960, Wagner published a study of mesothelioma in Crocidolite miners in South Africa.  This was the first paper to suggest a "possible association

---

[2] Fleischer, W.E., F.J. Viles, R.L. Gade, and Philip Drinker: A Health Survey of Pipe Covering operations in constructing Naval vessels. J. Ind. Hyg. & Toxicol. 28: 9 (Jan 1946). Dr. W. C. Dreessen of the USPHS also assisted.

between the development of mesotheliomas of the pleura and exposure to asbestos dust".
The exposures at which crocidolite miners were at risk for mesothelioma had not been
established. By far the majority of asbestos used in the United States was chrysotile, a
much different asbestiform mineral.  The ACGIH TLV committee at that time did not
have sufficient exposure information to propose a change in the industrial hygiene
exposure standard.  The third edition of an influential text by Hunter in 1962 recognized
that mesothelioma occurred with asbestosis in South African miners and in Britain and
that lung cancer was shown to occur with asbestosis in British asbestos textile workers
but the same was not found for asbestos miners in Canada.  The 5mppcf industrial
hygiene exposure standard for workplace exposure to asbestos proposed by Dreessen
stood as the US standard for 30 years and was not questioned until 1964 by Marr.  The
years of 1964 and 1965 were years of great change regarding the knowledge of asbestos-
related disease. The New York Academy of Sciences conference on the Biological
Effects of Asbestos was held in October 1964.  A series of 55 papers and one report were
published, among others, by Wagner,  Selikoff,  and Newhouse.  A seminal 1964 paper
by Selikoff broke new ground by demonstrating through a study of 1522 insulation
workers that asbestosis was a risk of insulators and was not confined to workers in
asbestos mines and mills.  This study considered lung cancer and other cancers (including
mesothelioma) to be complications of asbestosis. By the end of 1965, it was generally
accepted that mesothelioma was an asbestos-related disease that was associated with an
unknown level of crocidolite exposure.  An alternative (2mppcf and/or 12f/cc) was not
suggested by the American Conference of Governmental Industrial Hygienists until 1968
and no alternative was codified into any law until 1969.  In 1968, Balzer published the
landmark industrial hygiene review of insulator exposures and provided sufficient data
upon which to base a revised exposure standard for insulation workers. A reduction of the
TLV exposure standard was proposed for the industrial hygiene profession in the same
year.  In 1972, Selikoff established that Amosite, in addition to Crocidolite, was

carcinogenic for both lung cancer and mesothelioma.  In 1975, the results of the
Insulation Industry Hygiene Research Program, as directed by Selikoff, became available
and were first published in the asbestos worker trade publication  and by Nicholson in the
scientific literature a year later.   The risk of asbestos-related disease among various Navy
personnel was recognized in1978.

11.  In addition to the US Navy and US Department of Labor Occupational Health and
Safety Administration (as outlined above), other actions by the US General
Services Administration and the US Army Corp of Engineers (who designed, built
and in some cases maintained military facilities) demonstrates the knowledge of
the US Government military regarding asbestos. Like other buildings in America,
military housing and other buildings on military bases included building materials
containing asbestos such as pipe insulation, plumbing equipment, ceiling tiles,
vinyl asbestos floor tiles, roofing shingles, drywall joint compound, and other
typical asbestos-containing building materials. The military required such products
to be used in military installations in the "Index of Specifications, Standards and
Commercial Item Descriptions" by the United States General Services
Administration. In 1946, the US Army War Department issued Technical Bulletin
TB MED 223 that listed asbestos as a material to be controlled regarding
exposures of Army personnel at Army military installations. The Government
Printing Office through the War Department issued "Central Boiler Plants –
Inspection and Preventative Maintenance Services" in 1946, and required the use
of asbestos insulation for boilers. The US Army Corps of Engineers' Waterways
Experiment Station in 1959 even tested asbestos-containing materials and these
tests were relied upon by other government agencies.[3] The US Army Corp of

---

[3] Maines, R. Asbestos and Fire: Technological Trade-offs and the Body at Risk. ISBN 0813535751. 2005. Page143.

Engineers issued "Safety – General Safety Requirements," Specification EM 385-1-1, in 1967 that required among other items, asbestos fire blankets to be kept easily assessable.  The Department of Army issued Field Manual FM-55-5 entitled" Marine Engineman's Electrical Handbook" in 1977 that listed electrical insulation to insulate various equipment in Army vessels. The United States Army's Installation Asbestos Management Program (1998) is documented in Public Works Technical Bulletin 420-70-8 and notes all aspects of asbestos remediation planned at US Army facilities. Obviously the presence of such materials at US Army facilities was known to the US Army. Millions of dollars of cleanup are still needed at many military facilities; some such facilities associated with the Army include Fort Campbell Army Base; Fort Knox; Fort Bliss; Fort Bragg; and Camp Roberts, among others.

12. In summary, based upon available historical industrial hygiene scientific literature and the regulatory history of asbestos in the US and other available documents, it is clear that in the timeframe of 1956 through the 1980s the US Government knew what was knowable regarding the hazards and risks of asbestos as outlined above.

I declare under penalty of perjury that the forgoing is true and correct.  Executed on April 28, 2022.

Kyle B. Dotson, CIH



# Kyle B. Dotson, CIH, CSP, BCEE

4400 N. Scottsdale Road, Suite 9-906, Scottsdale, AZ 85251-3331
Office (480) 410-4126; Cell: (408) 234-1409
Website: www.dotsongroup.com
Email: kyle@dotsongroup.com

*Revision:* Jan-2022

## SUMMARY

An independent professional in Safety, Industrial Hygiene and Indoor Environmental Quality. Expertise in occupational safety and industrial hygiene programs, practices, systems and standards. Forty years of experience in the design, implementation, and continuous improvement of corporate management systems for the anticipation, recognition, evaluation and control of injury and disease risks. Holds accredited certifications in the three professions of Safety, Industrial Hygiene, and Environmental.

**_Litigation Support_** experiences have included serving as a testifying non-consulting expert witness in workplace injury and wrongful death litigation, asbestos litigation, and indoor environmental quality and construction defect litigation related to water intrusion and occupant exposure to "toxic" mold.

**_Technical and Management Services_** experiences have included a wide variety of safety, industrial hygiene and indoor environmental quality projects. Safety services have included fatality investigations and management system design, audit and evaluation, and executive coaching. Industrial Hygiene services have included exposure risk assessments of workplace health issues for asbestos, lead, benzene, silica and many other substances at about 1000 workplaces. Indoor Environmental Quality services have included construction defect and water intrusion related "toxic" mold exposure assessments of over 3000 residential and commercial buildings, including nosocomial risks during healthcare facility construction.

**_Corporate Safety and Industrial Hygiene_** employment experiences have included serving as Director or Vice President of Safety and Health at three global corporations in the industrial sectors of manufacturing, mining, construction, petroleum, steel, insurance, telecommunications, & electric power generation.

**_Professional Leadership_** experiences have included serving on the national Board of Directors of the American Industrial Hygiene Association (AIHA) and as a frequent speaker at national and international occupational safety and industrial hygiene conferences sponsored by the American Society of Safety Engineers, National Safety Council, AIHA, and Indoor Air. Technical resource expert to the American National Standards Institute Z-10 Committee on Occupational Health and Safety Management Systems. A recipient of safety and industrial hygiene professional awards including the AIHA Fellow, Best Selling Publication, Champions of Safety, and AIHA Kusnetz (*Outstanding Professional in Industry)* Award.

## EDUCATION

Master of Science, Environmental Science, 1987, University of Texas at Dallas, Richardson, TX.
Bachelor of Science, Natural Science, 1979, McMurry University, Abilene, TX.
Peter Drucker Executive Mgmt/Leadership Series, 2005-06, Corpedia eLearning, Calpine University.
Global Executive Leadership, 1996, Thunderbird / Amer. Grad. School of Int'l Mgmt., Phoenix, AZ.

## CERTIFICATIONS

- American Board of Industrial Hygiene (CIH #3562) since 1987
- Board of Certified Safety Professionals (CSP #7844) since 1986
- Board Certified Environmental Engineer (Amer. Academy of Environmental Engineers) since 2000
- Registered Professional Engineer (Commonwealth of Massachusetts, MA#37618, Safety) since 1993
- Certified Professional Environmental Auditor (Health and Safety), BEAC, since 2002

EXHIBIT A

## *WORK EXPERIENCE*

### Dec 2000 – Present: President, DOTSON Group, LLC, Carmel, CA
*(Incorporated in TX in Dec 2000, relocated to San Jose, CA 2005; Los Altos, CA 2012; Carmel, CA 2018.)*
Management and strategic safety/health corporate support services, litigation support non-consulting expert witness services, and industrial hygiene technical services for a wide variety of clients in the mining, manufacturing, insurance, real estate, construction, food, transportation, and healthcare industries. <u>Safety</u> services have included presentations at corporate safety conferences, organizational design and management system assessment services, and third-party representation on corporate safety and health audit teams. <u>Litigation</u> support and expert witness services have included construction defect, workplace injury and occupational disease litigation involving asbestos and/or mold exposure risks. <u>Industrial Hygiene</u> services have included on-site exposure assessment at a wide variety of work locations, and several thousand indoor air quality "toxic mold" building construction assessments conducted for major insurers, home and commercial builders and hospital/healthcare organizations.

### Mar 2006 – Aug 2006, Vice President, Safety Health and Environment    Calpine Corporation
### Feb 2004 - Mar 2006, Vice President & Corporate Safety Officer                San Jose, CA

Calpine Corporation is one of North America's leading power companies, with $9 billion in revenue and 26,000 megawatts of capacity. Calpine operates 92 natural gas and geothermal powered energy generation plants in North America. Currently in reorganization after bankruptcy in 2005. Previously, the company was traded on the NYSE and listed in the S&P 500.

Contracted as the DOTSON Group to provide safety compliance auditing services. Joined fulltime in Feb 2004 and served as the functional head for all safety and health programs and professional staff. Promoted in July 2005 to also lead Calpine University, the companies' internal training function. Promoted in March 2006 to also lead the Environmental function during the staff reorganization phase.
*Representative Accomplishments*: Led the organizational development of corporate-wide best practice safety and health and environmental management systems. Implemented a contractor safety management process for 2500+ vendors and suppliers. Implemented a best practice construction contractor safety management assurance process. Developed and implemented Calpine Safety and Health Policy and 40 Guidelines based on the ANSI-Z10 American National Standard for Occupational Health and Safety Management Systems. Produced corporate video featuring CEO, plant managers and staff.
*Results:* From 2003 to 2006, corporate-wide operations achieved a 57% reduction of Lost Time injuries among all employees and contractors. Achieved injury rates among the best 20% of the US power industry. Obtained OSHA recognition of multiple company operations as "Star" sites through OSHA's Voluntary Protection Program (VPP). The company was recognized at the 2005 American Safety Congress as one of "America's Safest Companies" by Occupational Hazards magazine.

### September 1996 - Dec 2000                        BHP Limited (Various Business Units)
### Vice President, Health Safety and Environment        San Francisco, CA and Houston, TX

The Broken Hill Proprietary Company Limited (now BHP Billiton) is one of the world's 50 largest corporations, and is the largest industrial corporation in Australia. BHP at the time was a global natural resources company, with interests in petroleum, mining and steel production. The company had 1997 revenues of US$ 19 Billion, with 70,000+ employees and contractors in 50 countries.
*Corporate Role* (11/99-11/00): Led the integration of global information systems for environmental health and safety, served as a Business Unit Management System Auditor, served as the subject matter expert for implementation of knowledge sharing networks, and assisted corporate move to "shared services".
*Business Unit Roles* (9/96-11/99): Promoted twice and relocated once. Served as functional head of HSE for the copper, platinum, diamond, oil sands, and lead-zinc-silver operations of two Business Units and one Division of BHP, comprising 20,000+ employees and 10,000+ construction contractors. Locations included Arizona, Nevada, NW Territories of Canada, Zimbabwe, Chile, Peru, Australia, and Papua New Guinea. Directly managed a budget of $950K. Directed site staff of 100+ and expenditures of US $30+ Million.
*Representative Accomplishments*: Published a seven-year Strategic Plan for Safety and Health Excellence in 1996, and implemented until reorganization in 1999. Developed a best practice safety management system based on ISO 9000 Quality principles, and implemented as the BHP Copper 5 Star Safety and Health System

EXHIBIT A

in three languages at all operations worldwide. From development in late 1996 to September 1997, site program conformance with 98 system elements increased from 54% to 73%.

*Results:* From Sept 96 to Nov 99, Business Unit operations achieved a 70% reduction of serious injuries among all company employees and construction contractors. BHP Copper achieved the status of the second safest large mining company behind the industry leader, Phelps Dodge Corporation. Achieved Business Unit injury rates among the best 10% of their US industry averages.

**February 1991 - September 1996**                        **Phelps Dodge Corporation**
**Director, Occupational Health & Safety**                  **Phoenix, Arizona**

Phelps Dodge Corporation (now Freeport-McMoRan Corporation) at the time was an international diversified manufacturing and mining company with 15,000+ employees at 50 operations in 27 countries, and 1995 revenues of $4.1 billion. A *Fortune* 500 company, Phelps Dodge was the world's second largest producer of carbon black and the world's second largest publicly traded copper mining company. In 1996, the Company was also the leading North American fabricator of wheels and rims for medium and heavy trucks, the largest US manufacturer of magnet wire, and a major world producer of wire and cable. Managed a department budget of $550K, with an additional $500K charged to sites.

*Representative Accomplishments*: Published corporate-wide health and safety management standards. From 1993 to 1995, site conformance with 48 best management practice standards increased from 75% to 85%.

*Results:* Phelps Dodge achieved a leadership position in safety in the mining industry in the early 1990's. In 1992, 1993 and 1995, Company properties were named the safest surface mines in America by the U.S. Department of Labor's Mine Safety and Health Administration (MSHA). All operations (mining and industrial) had injury rates among the best 25% of their composite U.S. industry average. Most were among the best 10% of their industry. The 1995 total recordable injury rate for all Phelps Dodge employees and contractors worldwide was 2.7, a 70% improvement from 1991 through 1996.

**December 1987 – February 1991**                      **Maxim Environmental/Engineers, Inc**
**Vice President - Industrial Hygiene, Manager - Industrial Hygiene**         **Dallas, Texas**

Maxim Technologies was acquired in 2001 by TetraTech; one of the largest environmental consulting firms in America. Recruited from Nortel to this small privately owned consulting firm when sales were less than $1 million. Title change to Vice President in October 1990 reflected increased responsibility from the growth of the company's Environmental Division from 10 to 170 employees over the previous three year period. Administration and technical oversight responsibility extended to seven offices in Texas, New Mexico and Arizona. Was responsible for the administration and technical support of industrial hygiene consulting services, and had direct accountability for Profit and Loss for all Industrial Hygiene operations. Achieved consistent profitable growth. Directly managed the activities of a four member professional staff, indirectly managed a staff of 50+, and provided consultation services to clients as a staff Certified Industrial Hygienist.

*Representative Accomplishments*: Expert witness and dose simulation studies for law firms, EPA/OSHA compliance audits for multi-facility manufacturers, health and safety for hazardous waste remediation sites, safety studies of industrial operations, training course development, OSHA response services, oversight of asbestos abatement for school districts, indoor air quality surveys for the federal government, occupational disease investigations, exposure risk assessments, environmental impact studies, chemical database projects, and exposure monitoring and control studies for clients in the semiconductor industry. Clients included a wide range of corporate (such as Exxon; now Exxon Mobil), and government (GSA, Schools) organizations.

**December 1986 - December 1987**                      **Northern Telecom, Inc. (Nortel)**
**Safety Coordinator**                                    **Richardson, Texas**

Conducted field safety and industrial hygiene evaluations and program development for the commercial telephone system business of Northern Telecom, now known as Nortel Networks. Designed and implemented an Asbestos Exposure Control Program for 2,200 field installation personnel. Supported ergonomic tool modification implementations at the Santa Clara, California manufacturing facility.

*Kyle B. Dotson, CIH, CSP, BCEE - DOTSON Group, LLC - www.dotsongroup.com; Email: kyle@dotsongroup.com*
*4400 N. Scottsdale Road, Suite 9-906, Scottsdale, AZ 85251-3331. Office (480) 410-4126; Cell (408) 234-1409*

3

EXHIBIT A

**December 1981 - December 1986**                                    **Hartford Insurance Group**
**Industrial Hygienist**                                                          **Dallas, Texas**
Provided industrial hygiene technical support for 25 safety representatives. Conducted industrial hygiene surveys, pollution liability surveys, and evaluated accounts with serious health risks. Provided training programs for Hartford and client personnel. Reviewed occupational disease related workers compensation claims. Personally conducted over 700 industrial hygiene related evaluations over a five-year period.

**June 1980 - December 1981**                                        **Aetna Life & Casualty**
**Engineering Representative**                                                 **Dallas, Texas**
Provided safety-consulting services to corporate customers in manufacturing and construction sectors. Received formal risk management training recognized as among the most comprehensive in the industry.

## PROFESSIONAL AWARDS

- Fellow, American Industrial Hygiene Association; awarded 2006.
- Best Selling Publication Award, (lead author of *Assessment, Remediation, and Post-Remediation Verification of Mold in Buildings),* American Industrial Hygiene Association, awarded 2005.
- Kusnetz *Outstanding Professional in Industry* Award, American Industrial Hygiene Assoc., 1996.
- Champions of Safety Award, (Corporate Staff Excellence) Occupational Hazards Magazine, 1995.

## PROFESSIONAL ORGANIZATIONS

*Current Leadership Roles*
- AIHA Named Awards and Fellows Selection Committee, 2022.
- AIHA Human Capital/ESG (Environmental-Social-Governance) Task Force. 2021-present.
- U.S. Technical Advisory Group to the Int'l Org. for Standardization (ISO). ANSI/ ASSE PC 283, Occ. Health and Safety Mgmt Systems (ISO 45001). 2013-present. Draft7/17;  Int'l Standard Approved 1/2018. ANSI/ASSP Z16.1 – 202X (also ISO 45004 TC 283 WG4) American National Standard for Safety and Health Metrics and Performance Metrics 2020-present.
- Chair, AIHA Indoor Environmental Quality SIG, 2007-present.
*Previous Roles and General Memberships*
- AAEE Industrial Hygiene Committee - Member, 2010-present. Proctor, Oral Exams, 2010-2017.
- ANSI/AIHA (now ASSE) Z-10 H&S Management System Accredited Standards Committee -Technical Resource, 2010, Committee Member, 2011-2019. Reaffirmed 2017. Final ANSI/ASSP Z10, 2019.
- Vice Chair, AIHA I2P2 Taskforce. 2010. Representative of AIHA as Secretariat of ANSI  Z-10, OSHA Injury and Illness Protection Program (I2P2) Stakeholder meeting, Dallas, TX, 6/10/2010.
- American Industrial Hygiene Association (AIHA) - Board of Directors, 2000-2004. Board of Trustees, AIH Foundation, 2000 - 2007. Professional Development Course Instructor (Management Systems),  2005-2013. Green Building, 2008-13. Co-Chair, Indoor Environmental Quality Taskforce 2002-03. Chair,  AIHA Mgmt Committee, 1996-97; President, North Texas, 1988-89. Member since 1986.  Fellow since 2006. AIHA Nominating Committee, 2018. Mining Work Group, 2014-present; Mgmt Committee, 1990s-present.
- American Academy of Industrial Hygiene, Diplomate 1987-present. Nominating Committee, 2007.
- Product Stewardship Society, Affiliate of AIHA. 2017-present.
- National Society of Professional Engineers, 2019-present.
- American Society of Safety Engineers (ASSE); now American Society of Safety Professionals (ASSP). Member 1982- Present. Treasurer/Secretary/Vice Pres, SW Chapter, 1988-91. Perf. Mgmt Symposium Taskforce, 2006-07. ASSE Comments on OSHA Safety & Health Program Management Guidelines, 2016.
- British Occupational Hygiene Society (BOHS). International Partner General Member, 2018-present.
- International Society of Indoor Air Quality and Climate (ISIAQ). Member, 2009-present.
- ORC Occupational Safety and Health Executive Business Issues Forum, 4/5-6/2000, 2004-2006. ORC Occupational Safety and Health Group - Wash, DC and CA cities, 1992-2000, 2004-2006.
- American Chemistry Council (formerly CMA) CHEMSTAR Panel on Acid Mist, 1992-2001.
- Arizona Special Waste Governor's Advisory Committee, 1991-1996.
- Environmental Health & Ind. Hygiene Subcommittee of the Carbon Black Industry, 1993-1996.
- Editorial Review Board, *Industrial Safety and Hygiene News* Magazine, 1995-2005.
- Nat Asbestos Council - Board of Directors, TX Chapter, 1989-91; Licensing/Reg Affairs, 1989-1990.
- The Conference Board, Member, Health and Safety Council. New York, NY. 1996-2000.

- Cambridge Center for Behavioral Studies, Member, Board of Advisors (Safety), 1996-present.
- American Conference of Governmental Industrial Hygienists (ACGIH), Member, 1987-present.
- National Association of Environmental Managers (NAEM), Member, 1999-present.
- American College of Occupational and Environmental Medicine, Associate Member, 2007-present.

## *PUBLICATIONS*

*Book Chapters, Practice Standards and Guidelines*

- *AIHA Industrial Hygiene Metrics Manual, Second Edition.* Chapter Author, Indoor Air Quality. AIHA Management Committee. In Publication 2021.
- *Patty's Industrial Hygiene, Seventh Edition.* Co-Author, Chapter #1 Volume #1: Occupational and Industrial Hygiene as a Profession: Yesterday, Today and Tomorrow. April 2021.
- *Safety Supervision. 3rd Edition.* Dan Petersen with Kyle Dotson and Dave Johnson. ©2020. 298 pages. ISBN-10: 0939874288. ISBN-13: 978-0939874286.
- *Recognition, Evaluation, and Control of Indoor Mold.* Author: Appendix B – Mold in Buildings, Exterior and Interior Images. AIHA Press. 1st Edition, 2008. 2nd Edition, 2020.
- *American National Standard – Occupational Health and Safety Management Systems.* Committee Member, Co-Author; published by the ANSI/AIHA (now ASSE) Z-10 Committee. ©2012. ISBN: 978-1-935082-35-4. Reaffirmed 2017.
- *Patty's Industrial Hygiene, Sixth Edition.* Chapter 44 Co-Author: Occupational Health and Safety Management Systems. Edited by V. E. Rose and B. Cohrssen. ©2011. ISBN 978-0-470-07487-9.
- *Assessment, Remediation, and Post-Remediation Verification of Mold in Buildings.* Lead author, Industry Guideline publication of the American Industrial Hygiene Association, September 2004.
- *Surface Mining Methods,* Chapter Author, Encyclopedia of Occupational Health and Safety, 1997, International Labor Organization (ILO), Geneva, Switzerland.
- *Industrial Hygiene Auditing: A Manual for Practice.* Contributing Author, AIHA Press, 1994.

*Articles-Peer Reviewed*

- *Executive Safety Leadership.* Dan Petersen and Kyle Dotson. Professional Safety. May 2007.
- *Dotson, KB and Schneider, JE. Prevalence of Stachybotrys in Outdoor Air of Houston Area Residences.* Proceedings – Indoor Air 2002.
- Dotson, K.B. (1997) *Development of International Corporate Health and Safety Guidelines.* Applied Occupational and Environmental Hygiene, 12:12, 889-895, DOI: 10.1080/1047322X.1997.10390624.
- *An International Safety and Health Measurement Strategy: Corporate Programs, Systems and Results.* Journal of Occupational Health & Safety - Australia-New Zealand. 1996; 12(6): 669-678.

*Articles-Popular Press and Professional Publications*

- *Comments From Members of the TAG – Potential Impact of ISO 45001.* U.S. Technical Advisory Group to the International Organization for Standardization (ISO). ANSI/ ASSE PC 283, Occupational Health and Safety Management Systems (ISO 45001). ASSE Tech Brief. July 2015.
- *Integrating Health and Safety into the Supply Chain: Industrial Hygienists Can Affect Change Beyond Organizational Boundaries.* Kyle Dotson and John Henshaw. AIHA *Synergist,* May 2009.
- *Assessment, Remediation, and Post-Remediation Verification of Mold in Buildings.* In MOLD: A Mold Property and Personal Injury Litigation Magazine. Harris Martin, Publisher. Apr/May 2008.
- *ANSI/AIHA Z10 and the Future of Industrial Hygiene Management.* AIHA *Synergist,* May 2007.
- *The Ethics of Mold Madness*, AIHA *Synergist,* May 2003.
- *A Few More Facts About Mold*, Article published in *Claims* magazine, July, 2003.
- *A CEO's Question: How Does Our IH Performance Compare?* AIHA *Synergist,* Oct 2001.
- Articles in IH & Safety News: *What You Should Know About "Toxic Mold",* 7/7/01; *We're Different Here: Don't Let Attitude be an Excuse,* 8/30/01; *Traditional (IH) Metrics Don't Meet Executive Needs,* 6/21/01; *Measuring Safety-Don't Just Count Injuries, Illnesses.* 4/30/01; *How to Coach Senior Managers,* 2/26/01; *How to Handle Health Complaints,* 4/13/2000.

*Other Publications*

- *AIHA White Paper: Injury and Illness Prevention Program (I2P2) - Recommendations Presented to Federal OSHA.* Kyle Dotson, AIHA I2P2 Task Force Vice-Chair. Published December 17, 2010.
- *Global Occupational Exposure Limits for 5,000+ Specific Chemicals,* Book Reviewer, 2006.
- *Testimony before Texas Senate Business & Commerce Committee,* Austin, TX, 9/4/2002, 2/25/2003.

*Kyle B. Dotson, CIH, CSP, BCEE - DOTSON Group, LLC – www.dotsongroup.com; Email: kyle@dotsongroup.com*
*4400 N. Scottsdale Road, Suite 9-906, Scottsdale, AZ 85251-3331. Office (480) 410-4126; Cell (408) 234-1409*

5

### PRESENTATIONS (Selected 10+ Year History)

- *The Evolution of the Industrial Hygiene Profession: A Long Strange Trip Historically for Industrial Hygiene to Total Worker Exposure.* AIHA Yuma Pacific 44th Annual Conf. San Diego, CA. 1/24/2019.
- *Exposure of a Household Occupant Bystander Member to a Household Launderer of Laundry Worn by a Bystander to Work by Others with Encapsulated Materials?* ACI 22nd National Forum on Asbestos Claims/Litigation. *Philadelphia*, PA. January 12-13, 2017.
- *Industrial Hygiene Perspectives on Household Secondary Exposure from Low Dose Products.* DALS Public Session. Las Vegas, NV. June 8, 2016.
- *Issues of Industrial Hygiene.* Perrin Conferences. San Francisco, CA. November 5, 2014.
- *Take-Home Exposure from a Bystander to Work with Encapsulated Asbestos Materials?* ACI 17th National Forum on Asbestos Claims/Litigation. Chicago, IL. June 27, 2014.
- *Bystander Exposure to Asbestos - A Review of Industrial Hygiene Literature.* 27th Annual Hilton Head Retreat. Hilton Head, SC. (Presentation by Phone). May 16, 2014.
- *Take-Home Asbestos Exposure - A Review of the Industrial Hygiene Literature.* Perrin Conferences. New Orleans, LA. November 6, 2013.
- *Take-Home Asbestos Exposure - A Review of the Industrial Hygiene Literature.* ACI 15th National Forum on Asbestos Claims/Litigation. New York, NY. October 8, 2013.
- *Annual Management System Review.* CS-101-05. AIHce. 2013. May 20, 2013.
- *Encapsulated Asbestos – Human Exposure, if Any, from "Locked-In" Fiber.* DRI Asbestos Medicine. Miami, FL. November 9, 2012.
- *Encapsulated Asbestos.* ACI 12th Annual Advanced Forum. Philadelphia, PA. January 27, 2012.
- *ANSI-Z-10: American National Standard for Occupational Health and Safety Management Systems.* Prevention through Design conference: Report on the National Initiative. National Institute for Occupational Safety and Health (NIOSH). August 24, 2011. Washington, DC.
- *Recent Developments in Industrial Hygiene Exposure Reconstruction.* Perrin. Beverly Hills, CA. 2/26/ 2010.
- *Industrial Hygiene Expert.* Asbestos Litigation Conference: Trial of a Take-Home Exposure Case from Jury Selection to Verdict. Harris Martin. June 22-23, 2009. Chicago, IL.
- *EHS Management Systems 101.* Co-Instructor, AIHce Prof. Dev. Course. 2005-13.
- *CIH Communications with CPAs & MDs.* AIHA Yuma Pacific. 1/23/2009. San Diego, CA.
- *Global EHS Mgmt Systems: Supply Chain Impact.* Prof. Conf. Ind. Hygiene. Tampa, FL, 11/10/08.
- *Asbestos and Silica, Mold and Meth Labs: IH Science in Litigation.* Guest Lecturer, Environmental Health and Safety Engineering Program, San Jose State University, San Jose, CA, Oct 29, 2007.
- *Exposure Assessment.* HarrisMartin Texas Asbestos Litigation Conf., Dallas, TX, Oct 16, 2007.
- *Implementation of ANSI-Z10.* (1) Phylmar, San Diego, CA 5-25-07. (2) ASSE, Sunnyvale, CA. 4-9-2007. (3) ORC Western Occupational Safety and Health Group, Scottsdale, AZ, 6-13-2007.
- *The Digital Dashboard - Real-Time Safety Leading Indicator with Corporate Intranet-Based Tracking Tool.* ASSE Symposium on Measuring Safety Success. Costa Mesa, CA. March 29, 2007.
- *The IH's Role: ANSI-OHS Mgmt Systems.* AIHA Yuma Pacific 32[nd]Annual, San Diego, CA 1/18/07.
- *Safety Mgmt Theory, Systems, Culture Change.* Guest Lecture, SJSU, San Jose, CA, 11/16/06.
- *Implementation of ANSI Z10.* Co-Instructor, (1) AIHCE, 5/13/06, 6/2/07, PCIH, 9/18/06.
- *ANSI-Z10.* 28th SEMI EHS Conf. Santa Clara, CA, 4-18-06. Co-Instructor, UC Berkeley, 11-1-05.
- *Best Practice Contractor Safety Management Processes,* Phylmar, San Francisco, CA, 10-26-05.
- *Exec Summary, AIHA 2005 3rd EHS Mgmt Systems Symposium,* NASA, Lake Tahoe, CA, 6/28/05.
- *Leadership, Systems, Metrics, and Emerging Issues-Putting it All Together, 3rd* Triennial EHS Management Systems Symposium, AIHCE, Anaheim, CA, May 22, 2005.
- *Managing Safety and Health Knowledge,* ORC OS&H Group, Washington, DC, Feb 2, 2005.
- *"Toxic Mold",* Presentation at AAIH Prof. Conf. Ind. Hyg. (PCIH), Toronto, Canada, Oct 5, 2004.
- *Strategic Planning, Corp Safety.* Business of Safety Symposium, ASSE, Dallas, TX, Mar 7-8, 2002.
- *Measuring Org Safety Climate: Injury Rates, System, Behavior, Culture.* ASSE, Anaheim, CA, 6/8/01.
- *Implementation of World-Class EHS Mgmt Systems at a Global Corp,* IOHA, Cairns, Australia, 7/2000.
- *Safety and Health Excellence & Issues in Mining, 2000* to book author Committee. Evolutionary
- and Revolutionary Techs for Mining. NRC, Nat'l Academy of Science. ISBN-0309073405. 2002.
- *Leading Corporate Change in EHS,* Nat. Assoc. Environmental Mgrs, Orlando, FL, Oct 11, 1999.
- *Leading Indicators for Safety and Health.* Seminar Instructor, PCIH, New Orleans, LA, Sept 27, 1999
- *Leadership of Change,* Professional Conf on Industrial Hygiene, New Orleans, LA, Sept 27, 1999.
- *Global EHS Ethics, Shared Services & Management Systems.* AIHCE, Toronto, Canada, Jun 99.
- *Return on H&S Investment Software: A Large Case Study,* ORC, Newport Beach, CA, 3-3-99.

*Kyle B. Dotson, CIH, CSP, BCEE - DOTSON Group, LLC - www.dotsongroup.com; Email: kyle@dotsongroup.com*
*4400 N. Scottsdale Road, Suite 9-906, Scottsdale, AZ 85251-3331.* Office (480) 410-4126; Cell (408) 234-1409

6

- *Shared Services in Env. Health and Safety,* The Conference Board. Coronado, CA, Jan 20, 1999.
- *Development & Implementation of a Common Safety & Health Mgmt System at International*
- *Operations*, IOHA 3rd Int'l Scientific Conference, Crans Montana, Switzerland, 12/13-18/97.
- *Development and Implementation of International Safety and Health Management System*
- *Guidelines at Phelps Dodge*, Minesafe '96, Perth, Western Australia, September, 1996.
- *Development of Mission/Vision Stmt for S&H Prof. Staff,* AICHE, Washington, DC, May, 1996.
- *Measurement of International Industrial Hygiene Success,* PCIH'95, San Diego, CA, October, 1995.
- *Building a Corporate Safety Culture*, Mine Safety and Health Administration, Minn, MN, June, 1995.
- *Measurement of IH Success: Perf. Metrics &Indicators,* AIHCE, Kansas City, MO, May, 1995.
- *Corporate Health and Safety Management,* National Safety Congress, San Diego, CA, October, 1994.

### PROFESSIONAL DEVELOPMENT EDUCATION (Selected 10+ Year History)

- *5th Annual Occ. Health and Ind. Hygiene Summit.* 3hr Webinar. Cal. Ind. Hyg. Council. 0.501CM. 3/10/21.
- *Silicosis in Engineered Stone Fabrication Workers.* 1hr Webinar. Cal. Ind. Hyg. Council. 0.17CM. 1/27/21.
- *Total Worker/Exposure/Health: Next Gen IH.* 1hr Webinar. California Ind. Hygiene Council. 0.167CM. 12/8/20.
- *AIHA National - Pivoting in Times of a Pandemic.* 1hr Webinar. Larry Sloan, AIHA CEO. 0.167CM. 10/13/20.
- *Amer. Ind Hygiene Conf and Expo,* AIHA, Various Cities, 1986-90, 1992-2014, 2016-18, virtual 2019-20.
- *Amer. Ind. Hygiene Assoc.* Yuma Pacific Annual Conf. S. CA. 2005-11, 2013-14, 2017-20, virtual 2021, 2022.
- *Professional Conference on Industrial Hygiene,* AAIH, Various Cities, 1988-90, 1992-2012, 2014, 2016.
- *International Occupational Hygiene Assoc.*, IOHA, 11th Scientific Conf., Wash, DC. Sept 24-26, 2018.
- *Asbestos and Nanoparticles: Using Benchmark Dose Methodology for Risk Assessment.* AIHA. 2/27/20.
- *Comparative Ethics.* Webinar Archive. AIHA. December 20, 2018.
- *Assessment, Monitoring and Mitigation of Naturally Occurring Asbestos (NOA) Hazards in the Western*
- *U.S.* Assoc. of Environmental & Engineering Geologists. Oakland, CA, Conv. Ctr. 12/6/12, 12/15/17.
- *Product Stewardship 2016. Baltimore, MD.* Product Stewardship Society, Affiliate of AIHA.
- *Applied Case Studies in EOHS Ethics.* Sponsored by ASSE. May 14, 2014.
- *Ethical EH&S: Eff. Implementation Corp. Social Resp., Global Eco.* ACGIH Webinar. 12/10/2009.
- Occ. Health; Silica Exposure & Control of Silicosis. AAIH. Vancouver, Canada. 10/4/2009.
- *Symposium on Advancements in Exposure Assessment.* AAIH. Vancouver, Canada. 10/1-2/2009.
- *West Coast Green Building Environment Conference.* San Jose, CA. 9/25-27/2008.
- *Exposure Modeling: Using Mathematical Models to Estimate Exposure.* Minn., MN. 5/31-6/1/08.
- *Emerging, Bio-Safety* 5/9/07, *Occ Health Nanomaterials.* AIHA Symposia. Menlo Park, CA. 5/14/08.
- *Bayesian Statistics* 9/21/07. *Toxicology Symposium.* AIHA/Soc. of Tox. Louisville, KY. 9/18-19/07.
- *CA Asbestos, Silica Litigation Conference.* HarrisMartin. San Francisco, CA. Sept 21, 24-25, 2007.
- *Nanoparticle Update:  Measuring, Evaluating, and Managing Exposures*, AIHA web, Mar 8, 2007.
- *Benzene Litigation Conference,* Mealey's/LexisNexis, New York City, NY, Dec 4-5, 2006.
- *Construction Defect /Mold Litigation,* Mealey's/LexisNexis, Scottsdale, AZ, Nov 6-7, 2006.
- *Mold, Allergens, Sampling, and Data Interpretation,* EMLab, Vacaville, CA, Sept 22, 2006.
- *Industrial Hygienists as Experts in Trials and Depositions,* PCIH, San Jose, CA, Sept 16, 2006.
- *Reconstructing Exposure & Dose*, AIHA Professional Development, Chicago, IL, May 14, 2006.
- *Construction Safety Conference,* Chicago, IL, February 14-16, 2005.
- *Environmental Mold: State of the Science, State of the Art,* AIHA, Dallas, TX, May 10, 2003.
- *Dose Reconstruction in the Occupational Setting,* PCIH, Cincinnati, OH, Sept 30, 2002.
- *California Industrial Hygiene Council Annual Conference,* San Francisco, CA, 2002, 2013.
- *Indoor Air 2002: 9th Int'l Conf.* Int'l Acad. of Indoor Air Sciences, Monterey, CA, 6/30 – 7/5, 2002.
- *Mold Medicine Mold Science.* Int'l Cntr. for Tox., Georgetown Univ, Wash, DC, May 13-14, 2002.
- *Healthy Indoor Environments 2002 Conference,* by Univ. of Tulsa, Austin, Texas, April 21-24, 2002.
- *Assessment of Microbiological Contamination in Indoor Environments*, AIHA, April 4, 2001.
- *Safety 2001, 2005 -* American Society of Safety Engineers, Anaheim, 2001; New Orleans, 2005.
- *Benchmarking EHS Info Mgmt Systems,* NAEM, Boston, 8/1-3/2000. NAEM Conf, Memphis, 10/08.
- *International Conference for Prevention of Silicosis,* Washington, DC, March 25-26, 1997.